# United States Court of Appeals
## For the First Circuit

No. 17-1421

STEPHEN ELLICOTT,

Plaintiff, Appellee,

v.

AMERICAN CAPITAL ENERGY, INC.,
THOMAS HUNTON and ARTHUR HENNESSEY,

Defendants, Appellants.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. F. Dennis Saylor IV, U.S. District Judge]

Before

Torruella, Selya, and Lynch,
Circuit Judges.

Robert K. Dowd, with whom Robert K. Dowd P.C. was on brief, for appellants.
Christopher A. Kenney, with whom Anthony L. DeProspo, Jr., and Kenney & Sams, P.C. were on brief, for appellee.

October 12, 2018

**TORRUELLA**, **Circuit Judge**.  This case concerns a contract dispute between a solar energy company and a former sales employee. Appellee Stephen Ellicott ("Ellicott") filed suit against Appellants American Capital Energy, Inc. ("ACE") and its two principals, Thomas Hunton ("Hunton") and Arthur Hennessey ("Hennessey") (collectively, "Appellants"), claiming violations of the Massachusetts Wage Act and breach of contract.  A jury found for Ellicott.  The district court entered judgment and awarded Ellicott $2,876,490 in damages, plus reasonable attorney's fees and costs.  Displeased with this result, Appellants challenge a series of rulings by the district court.  Appellants question, among other things, whether Ellicott's compensation constituted "wages" under the Wage Act and whether the statute of limitations for his Wage Act claim was properly tolled.  We affirm after careful review.

## I.  Background

**A. Factual Background**

The facts, viewed, as they must be, "in the light most favorable to the verdict," follow.  Sinai v. New England Tel. & Tel. Co., 3 F.3d 471, 472 (1st Cir. 1993).

Appellants Hunton and Hennessey are co-founders of ACE, a company that procures, engineers, and installs large-scale solar energy systems.  Hunton is ACE's president and Hennessey its chief

financial officer.  Hunton and Hennessey are principals of the company.

In 2007, ACE hired Ellicott as Director of Business Development, tasking him with the sale of large-scale solar installations to commercial clients, primarily in California. Ellicott was not a principal or joint-venturer of ACE, but rather a full-time employee compensated on a commission-draw basis.  On April 23, 2008, ACE executed a written contract that established Ellicott's compensation plan.  Among other provisions, the compensation plan stated that ACE would pay Ellicott a sales commission of "40% of profit margin on each sale and installation to be paid within [thirty] days after the client pays ACE and installation is complete."  The compensation plan also stipulated that the sales commissions "may be reasonably split with various sales support personnel by mutual agreement," and that ACE would pay Ellicott a monthly draw, equal to an annual rate of $120,000, credited against his commissions.

From 2007 to 2012, Ellicott sold nine solar installation projects.  For each of these projects, the parties stipulated at trial the (1) contract date; (2) project completion date; (3) final payment date; (4) project revenue; and (5) direct project costs.  The gross revenue of Ellicott's solar installation projects exceeded $37 million, with eight of the nine projects generating

a profit. Seven of the eight profitable installations were paid for in full more than three years before Ellicott filed suit on April 2, 2014. Below, the parties disputed whether Ellicott, in fact, made the "sale" on each of the projects and how the sales commission, if any was due, should be calculated. During trial, Ellicott testified that although it continued to pay him the monthly draw until October 2012, ACE did not pay his earned commissions from any of the profitable projects.

Beginning in 2010, and again in early 2011, Ellicott inquired about the payment status of his commissions to both Hunton and Hennessey. Ellicott had multiple conversations with Hunton, who assured Ellicott that he would discuss the issue with Hennessey and that the commission payments would be taken care of.

In October 2011, Ellicott had an in-person meeting with both Hunton and Hennessey to follow up on the payment status of his commissions. There, Hunton and Hennessey informed Ellicott that: (1) he should share his commissions with ACE's support staff; (2) ACE would deduct 5.6% from his commissions for overhead and burden costs and 1% for maintenance costs; (3) certain solar installment projects were actually considered "house accounts" and therefore not a "sale" by Ellicott for which he was entitled to a commission; and (4) ACE would apply a 30% commission rate rather than the 40% established in the 2008 compensation plan. Ellicott

-4-

did not agree to any of these additional compensation conditions, which were being presented to him for the first time. The meeting ended without resolution. Before concluding, Hennessey told Ellicott that ACE "should be able to start getting [him] some of [his] commissions in December," and that they would provide him with an updated spreadsheet detailing his earned commissions. Ellicott, however, never received the updated spreadsheet.

After the October 2011 meeting, Ellicott continued to work for ACE and received his monthly draw until October 2012, when ACE ceased making these payments.[1] Ellicott nonetheless continued working for ACE after October 2012. Then, in June 2013, Ellicott's health insurance and cell phone coverage -- both provided by ACE -- were cancelled. Shortly thereafter, Ellicott stopped working for ACE, but the company never formally terminated his employment.

## B. Procedural Background

Ellicott filed suit against Appellants in Massachusetts Superior Court seeking compensation for the unpaid sales commissions on April 2, 2014. His complaint alleged two claims:

---

[1] Upon asking about why his monthly "draw was cut off," Ellicott was told that ACE was "having difficult[ies] making payroll" and that the "best thing" he could do in the meantime "would be to try to bring a new deal" to generate cash for the company. He worked, without pay, on securing two additional installation projects for ACE throughout 2013.

(1) violation of the Wage Act and (2) breach of contract. On May 16, 2014, Appellants removed the case to the United States District Court for the District of Massachusetts.

After some extensive motion practice, which included the district court's denial of the parties' cross-motions for summary judgment, Ellicott filed a motion in limine on July 22, 2016 to exclude from trial any extrinsic evidence suggesting that he was required to split his commissions. The district court allowed the motion in limine on December 23, 2016, thereby barring Appellants from introducing "extrinsic evidence to vary the unambiguous terms" of their 2008 compensation plan with Ellicott.

On December 30, 2016, two weeks before trial was set to commence, Appellants asked the district court to reconsider its grant of Ellicott's motion in limine and offered new testimony in an attempt to prove that Ellicott had agreed to split his sales commissions. Ellicott opposed reconsideration and moved to preclude Appellants from introducing testimony offered for the first time on the eve of trial. In open court, the district court denied Appellants' motion for reconsideration and granted Ellicott's request to exclude Appellants' proposed new testimony. The court excluded the proposed evidence, finding, inter alia, that it contradicted prior deposition testimony offered pursuant to Fed. R. Civ. P. 30(b)(6).

-6-

A jury trial was held from January 17 until January 24, 2017. At the close of evidence, Appellants unsuccessfully moved for directed verdict on Ellicott's Wage Act claim, arguing that the Wage Act did not apply to Ellicott's sales commissions. On January 24, 2017, the district court charged the jury.

The jury verdict form listed ACE, Hunton, and Hennessey separately, and tasked the jury with finding liability and the amount of damages as to each. The jury found all three defendants liable under the Wage Act, but allocated $958,830 in damages under the Wage Act to ACE and $0 to Hunton and Hennessey. The jury also found ACE liable for breach of contract.

All parties urged the court to ask the jury to reconsider its answers. After conferring with both sides at sidebar and finding the verdict to be inconsistent, the district court asked the jury to reconsider its responses about Hunton's and Hennessey's liability under the Wage Act. The jury then returned a new verdict form that again found all defendants liable under the Wage Act, but this time allocated $758,830 in damages to ACE and $100,000 to each individual defendant.

Appellants immediately moved for mistrial, a request that the district court denied. On February 2, 2017, Appellants moved again for mistrial, contending that the district court erred in granting Ellicott's motions in limine, and for judgment

notwithstanding the verdict, arguing that Ellicott's sales commissions were profit-based and therefore fell outside the Wage Act's scope.  The district court denied both motions.

On February 6, 2017, the district court entered judgment in favor of Ellicott on both claims, pursuant to the jury's second verdict form.[2]  The final judgment totaled $2,876,490, plus reasonable attorney's fees and costs.

About a month later, Appellants filed a motion to modify the award under Fed. R. Civ. P. 59(e).  Therein, Appellants argued that the district court should lower their personal liability to $2,276,490 because (1) the court had erred in finding them liable for a greater damages award than the corporate defendant; (2) there was insufficient evidence to establish tolling as to Ellicott's Wage Act claim against Hennessey; (3) the court should not have granted the motion in limine barring evidence as to whether Ellicott had agreed to split his sales commissions; and (4) the

---

[2]  As to the Wage Act, the district court ordered ACE to pay damages in the amount of $758,830, trebled pursuant to Mass. Gen. Laws ch. 149, § 150 (for civil actions alleging violation of the Wage Act filed independently of any enforcement actions by the attorney general), for a total sum of $2,276,490, plus reasonable attorney's fees and costs. The district court also ordered each individual defendant to pay damages in the amount of $100,000, trebled pursuant to Mass. Gen. Laws ch. 149, § 150, for a total sum of $300,000, plus joint and several liability for any amount owed by ACE.  With regards to the breach of contract claim, the district court ordered ACE to pay damages in the amount of $958,830.

Wage Act did not apply to Ellicott's sales commissions because the commissions were profit-based. The district court denied Appellants' motion on April 3, 2017.

## II. Discussion

Appellants' challenge is limited to a series of rulings by the district court and the sufficiency of the evidence about whether Ellicott's Wage Act claims were equitably tolled. We address each of the issues raised by Appellants in turn.

### A. Applicability of the Wage Act

Whether Ellicott's sales commissions constituted wages under the Wage Act was put to the jury, and implicit in the jury's verdict was the determination that the commissions did constitute wages. Accordingly, we may only "overturn the verdict when the evidence leads a reasonable person to one conclusion and one conclusion only: that the losing party was entitled to win." Sinai, 3 F.3d at 472-73; see also Segal v. Genitrix, LLC, 87 N.E.3d 560, 575 (Mass. 2017).

The Wage Act imposes liability on employers who fail to pay wages earned by their employees. See Mass. Gen. Laws ch. 149, § 148 (2009). To establish a Wage Act claim, a plaintiff must show that: (1) he was an employee under the Wage Act; (2) the compensation constitutes wages pursuant to the Wage Act; (3) the Wage Act was violated; and (4) any individual defendants were

corporate officers as defined by the statute. See Stanton v. Lighthouse Fin. Servs., Inc., 621 F. Supp. 2d 5, 10 (D. Mass. 2009) (citing Allen v. Intralearn Software Corp., 2006 Mass. App. Div. 71, 72 (Mass. Dist. Ct. 2006)). Our only concern here is whether Ellicott's compensation represents "wages" under the Wage Act. We conclude that it does.

Under the Wage Act, "the payment of commissions" represents wages "when the amount of such commissions, less allowable or authorized deductions, has been definitely determined and has become due and payable to such employee." Mass. Gen. Laws ch. 149, § 148 (2009). Compensation based on commissions has been "definitely determined" when it is "arithmetically determinable." Wiedmann v. Bradford Grp., Inc., 831 N.E.2d 304, 312 (Mass. 2005); see also McAleer v. Prudential Ins. Co. of Am., 928 F. Supp. 2d 280, 287 (D. Mass. 2013); Okerman v. VA Software Corp., 871 N.E.2d 1117, 1124-25 (Mass. App. Ct. 2007). Moreover, a commission is "due and payable" when dependent contingencies have been met and it is thus owed to the employee. See McAleer, 928 F. Supp. 2d at 288.

Appellants maintain that Ellicott's compensation scheme was more like profit-sharing, and therefore not a commission as defined by the Wage Act. They contend that Ellicott's compensation was based on future profits and not fixed to the installation price

-10-

at the time of sale. We disagree. Ellicott's compensation meets the two criteria for a commission to fall squarely within the scope of the Wage Act: being "definitely determined" and becoming "due and payable." Okerman, 871 N.E.2d at 1121–22.

First, for Ellicott's sales commissions to be "definitely determined," they must be "arithmetically determinable." Wiedmann, 831 N.E.2d at 312. The parties do not dispute the figures necessary to calculate Ellicott's sales commissions to the dime. As explained earlier, the parties stipulated to the contract, project completion, and final payment dates, along with the project revenue and direct project costs, for each of the solar installation projects sold by Ellicott. The compensation plan entitled Ellicott to 40% of the profit margin on each sale and installation. Thus, because the profit margin for each sale can be "arithmetically determined" from the stipulated project revenue and the direct project costs, Ellicott's commissions are "definitely determined" under the Wage Act.

Second, Ellicott's compensation also satisfies the Wage Act's "due and payable" requirement. All dependent contingencies for the payment of Ellicott's commissions were met. See McAleer, 928 F. Supp. 2d at 289; Barthel v. One Cmty., Inc., 233 F. Supp. 2d 125, 127 (D. Mass. 2002). In the ordinary case, a commission "becomes due and payable when the employee closes the sale, even

if there is a delay in actual payment on the sale." <u>McAleer</u>, 928 F. Supp. 2d at 289.  But, when as here, "a compensation plan specifically sets out the contingencies an employee must meet to earn a commission, courts apply the terms of the plan." <u>Id.</u>  The 2008 compensation plan between ACE and Ellicott required only that: (1) the project generate a profit; (2) the client pay ACE; and (3) installation be complete.  As stipulated by the parties, all three contingencies were met on the eight profitable solar installation projects for which Ellicott seeks payment of his commissions.

Since Ellicott's compensation is "definitely determined" and "due and payable," the jury could reasonably conclude that his commissions are covered under the Wage Act.

**B.  Equitable Tolling**

We now turn our attention to Appellants' contention that there was insufficient evidence to support a finding that the Wage Act's three-year statute of limitations had been equitably tolled. Alternatively, Appellants contend that the equitable tolling evidence presented against Hennessey was particularly "flimsy," and that this court should reverse the Wage Act judgment as to that individual defendant.

Jury findings of fact as to whether the statute of limitations has been tolled cannot be set aside unless the evidence is insufficient to support the verdict.  <u>See</u> <u>Santiago Hodge</u> v.

-12-

Parke Davis & Co., 909 F.2d 628, 633 (1st Cir. 1990).

Wage Act claims are subject to a three-year statute of limitations that attaches separately to each individual violation of the act. See Mass. Gen. Laws ch. 149, § 150 (2009); Crocker v. Townsend Oil Co., 979 N.E.2d 1077, 1085-86 (Mass. 2012). "Massachusetts courts have recognized that it would be unfair to begin running the statute of limitations before a plaintiff is put on notice [of] a claim." Cambridge Plating Co. v. Napco, Inc., 991 F.2d 21, 25 (1st Cir. 1993).

Equitable tolling based on fraudulent concealment is cognizable with respect to the Wage Act statute of limitations. See Crocker, 979 N.E.2d at 1083-84. It applies when a plaintiff is "affirmatively misled" by a defendant. Hall v. FMR Corp., 559 F. Supp. 2d 120, 126 (D. Mass. 2008) (citations omitted). Thus, "[w]here a 'defendant[] made representations [he] knew or should have known would induce the plaintiff to put off bringing suit and . . . the plaintiff did in fact delay in reliance on the representations,' the statute of limitations is tolled." Mass. Eye & Ear Infirmary v. QLT Phototherapeutics, Inc., 412 F.3d 215, 242 (1st Cir. 2005) (citations omitted); see also Rakes v. United States, 442 F.3d 7, 26 (1st Cir. 2006) ("[E]quitable tolling is based on concealment or other misconduct by the defendant." (citing Crawford v. United States, 796 F.2d 924, 926 (7th Cir. 1986))).

-13-

Still, a plaintiff "may not generally use the fraudulent concealment by one defendant as a means to toll the statute of limitation against other defendants." Passatempo v. McMenimen, 960 N.E.2d 275, 290 (Mass. 2012) (citing Griffin v. McNiff, 744 F. Supp. 1237, 1256 n.20 (S.D.N.Y. 1990)).

The statute of limitations on Ellicott's Wage Act claims would have begun to run on the date that payment of his sales commission was due on each of the solar installation projects he sold. According to Ellicott's compensation plan, that would be "[thirty] days after the client pa[id] ACE and installation [was] complete[d]." Thus, per the parties' stipulated facts about the final payment and project completion dates for the projects at issue, all except one of Ellicott's unpaid commission claims would fall outside of the Wage Act's usual three-year statute of limitations window.

However, at trial, Ellicott set forth evidence that Appellants had "affirmatively misled" him before the October 2011 meeting. Hall, 559 F. Supp. 2d at 126. The record shows that both Hunton and Hennessey perpetuated the narrative that a shrinking cash flow was the only reason why Ellicott did not receive commission payments in accordance with his compensation plan, and such assurances were what stalled Ellicott from taking legal action at the time. In an ongoing dialogue from 2010 to 2011, Hunton

repeatedly promised Ellicott that their contract would be honored: "be patient, we're dealing with cash flow issues, we will pay you, so hang in there." Later in 2011, responding to increased pressure from Ellicott, Hunton sent him an email, reiterating that "cash is tight" but still promising to try to "squeeze something out."

The jury found that Appellants "made representations [they] knew or should have known would induce [Ellicott] to put off bringing suit and [he] did in fact delay in reliance on the representations." Mass. Eye & Ear Infirmary, 412 F.3d at 242 (citations omitted); see also Santiago Hodge, 909 F.2d at 633. We agree and conclude sufficient evidence supports the jury's finding that fraudulent concealment warranted the equitable tolling of the three-year statute of limitations. Ellicott's Wage Act claims therefore ripened in October 2011, when Hunton and Hennessey first told Ellicott that ACE would not pay his commissions per the terms of the 2008 compensation plan. Since Ellicott filed his complaint on April 2, 2014, his Wage Act claims are well within the three-year statute of limitations.

While it is true that Ellicott may not "use the fraudulent concealment by one defendant as a means to toll the statute of limitation against other defendants," Passatempo, 960 N.E.2d at 290 (citations omitted), the record also contains sufficient testimonial evidence regarding Hennessey. For instance,

-15-

Hennessey, along with Hunton, reassured Ellicott in an early 2011 meeting that he would be paid his commissions at the 40% rate. On this record, the jury was entitled to find that Hunton and Hennessey were joined in their efforts to assure Ellicott that his promised commissions would be paid. Accordingly, we find that tolling the statute of limitations so as to allow Ellicott's Wage Act claims against Hennessey was justified.

## C. Jury Verdict Forms

Appellants' next claim is that the district court erred, first, when it did not accept the initial jury verdict, and later when, after accepting the second jury verdict form, it assigned Wage Act damages liability to Hunton and Hennessey that were internally inconsistent. Below, however, Appellants neither objected to the district court's rejection of the first jury verdict, nor did they raise this contention in their multiple post-verdict motions.[3] In fact, Appellants encouraged the district court to resubmit the first verdict form to the jury for

---

[3] Appellants only complained in two post-verdict motions that the multiple jury verdict forms confused the jury -- thus calling for a mistrial. However, that was insufficient to preserve the arguments Appellants now attempt to raise for the first time on appeal. See Eldridge v. Gordon Bros. Grp., LLC, 863 F.3d 66, 84 (1st Cir. 2017) ("[A] party is not at liberty to articulate specific arguments for the first time on appeal simply because the general issue was before the district court." (citing United States v. Slade, 980 F.2d 27, 31 (1st Cir. 1992))).

clarification.  Because Appellants did not raise this issue before the district court, they are foreclosed from raising it now for the first time.  See Bos. Beer Co. Ltd. P'ship v. Slesar Bros. Brewing Co., 9 F.3d 175, 179 (1st Cir. 1993) ("The law in this circuit is crystalline: a litigant's failure to explicitly raise an issue before the district court forecloses that party from raising the issue for the first time on appeal.").

**D.  Motions in Limine**

Lastly, Appellants ask us to review the district court's rulings on Ellicott's motions in limine.  Appellants contend that the district court erred when it excluded evidence about whether Ellicott had agreed to split his sales commissions.  We review a district court's decision to exclude evidence on a motion in limine for abuse of discretion.  See United States v. Guerrier, 428 F.3d 76, 79 (1st Cir. 2005) (citing Blinzler v. Marriott Int'l, 81 F.3d 1148, 1158 (1st Cir. 1996)).

Under Fed. R. Evid. 403, a district court should exclude evidence "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Ferrara & DiMercurio v. St. Paul Mercury Ins. Co., 240 F.3d 1, 6 n.3 (1st Cir. 2001).

District courts have wide discretion when it comes to determinations under Rule 403. "This is primarily because 'Rule 403 balancing is a quintessentially fact-sensitive enterprise and the trial judge is in the best position to make such fact-bound assessments.'" Id. at 6 (citing Udemba v. Nicoli, 237 F.3d 8, 15-16 (1st Cir. 2001)). On very rare occasions would this court "from the vista of a cold appellate record, reverse a district court's on-the-spot judgment concerning the relative weighing of probative value and unfair effect." Freeman v. Package Mach. Co., 865 F.2d 1331, 1340 (1st Cir. 1988). This is not such a case.

The district court, in a well-reasoned and narrowly tailored Memorandum and Order, properly excluded Appellants' extrinsic evidence related to the unambiguous terms of Ellicott's 2008 compensation plan on grounds that it could have confused the issues and misled the jury. Furthermore, the district court prudently disregarded the eleventh-hour affidavits from unannounced witnesses that Appellants intended to introduce six days before trial. Not only were these offered late without a reasonable excuse for delay, but they also contradicted prior Rule 30(b)(6) deposition testimony from the individual defendants themselves. See Thibeault v. Square D Co., 960 F.2d 239, 247 (1st Cir. 1992) ("We think it is beyond dispute that an eleventh-hour change in a party's theory of the case can be equally harmful,

perhaps more harmful, from the standpoint of his adversary."). We, therefore, discern no abuse of discretion from the district court's grant of Ellicott's motions in limine.

### III.  <u>Conclusion</u>

With no other issues raised by Appellants, for the reasons discussed above, we affirm the district court's judgment.

**<u>Affirmed</u>.**