The plaintiff, Thomas Daly, brought a complaint in Superior Court against the defendants for alleged unpaid commissions. In particular, he asserts that the defendant T-Mobile USA, Inc. (T-Mobile) improperly modified his commission schedule after he brought in a new customer account, and seeks to enforce an exemplary commission schedule set forth in T-Mobile's sales manuals. The motion judge allowed summary judgment in favor of the defendants on Daly's breach of contract, Wage Act, and unjust enrichment claims. Because (i) the manuals expressly provide that T-Mobile can modify the exemplary commission schedule at its sole discretion, at any time, (ii) the relevant modification occurred prior to any sales, and was acknowledged by Daly, and (iii) Daly accepted commissions pursuant to the modified schedule for over three years without following the grievance procedure set forth in the manuals, we affirm.[3]
Background. We recite the facts that are undisputed and, where there are disputes, we view the facts in the light most favorable to Daly, the nonmoving party. Okerman v. VA Software Corp., 69 Mass. App. Ct. 771, 780 (2007).
Daly began working as an at-will sales representative for T-Mobile in 2006. His compensation included two components: first, he was entitled to a base salary; and second, he was eligible to receive commissions to be paid on a quarterly basis. Commissions were not based on bringing in a new account. Instead, T-Mobile calculated Daly's commissions based on the number of SIMs[4] sold and activated each quarter.
Relevant to the present action, T-Mobile annually[5] distributed to its sales employees two manuals concerning commissions: (1) the "Sales Compensation Sales Incentive Program Document Policies & Procedures" (program manual), which details T-Mobile's commission guidelines and policies applicable to all salespeople, and (2) the position specific plan manual (plan manual), which outlines commissions for salespeople in particular employment positions. These manuals set forth certain metrics used to calculate commissions. The manuals provide that the exemplary commission schedules, therein, may be modified at T-Mobile's sole discretion, at any time. For one category of sales -- called "windfall" sales[6] -- the manuals allow T-Mobile to alter or cap commissions or even to exclude such sales altogether from the calculation of commissions. The manuals set forth a grievance procedure for any employee concerned about his or her commissions. The manuals also include disclaimers, the details of which we reserve for further discussion below. Daly acknowledges that he received the manuals.
In March, 2011, Daly learned of a new business opportunity with a company called SCVNGR, which wanted to purchase a data-only plan at a low cost. The deal that SCVNGR contemplated was not one of T-Mobile's standard offerings, and Daly included his immediate manager, Kevin Farren, early in these discussions, which took place from March to June of 2011.
Eventually, T-Mobile approved a deal for SCVNGR for a data-only rate plan of $9.99 per month per SIM unit; however, T-Mobile insisted on certain conditions. Relevant here, one condition was T-Mobile's decision to impose a 1:5 commission ratio for Daly's commissions on the SCVNGR account;[7] Daly received commissions at a 1:1 ratio, which was an exemplary commission schedule in the plan manual, on his other accounts. In particular, in May or June of 2011, Daly met with John Briare, Farren's manager, and was informed that T-Mobile would accept the rate plan for SCVNGR only if the commission formula for the account reflected the low margin value of the deal. Accordingly, Briare presented Daly with a document acknowledging the 1:5 ratio on the SCVNGR account, which Daly signed.[8] The meeting occurred before any sales to SCVNGR.
Following the meeting, Daly complained to Farren, asking whether Farren thought the 1:5 commission ratio was fair in view of other plans where the rate plan was even lower than for SCVNGR yet commissions were being paid on the 1:1 basis. Daly did not file a written complaint, and did not complain to anyone in human resources, or anyone else in management.
From June of 2011 to February of 2013, SCVNGR purchased SIMs from T-Mobile. Daly was timely paid for all commissions at the 1:5 rate.[9] Daly resigned from T-Mobile in June, 2015.
On July 23, 2015, Daly filed the present action, asserting claims for unpaid commissions -- specifically, the commissions he would have been paid if the commission ratio on the SCVNGR account had been 1:1. In addition to asserting claims under the Wage Act, Daly alleged that the sales manuals constituted a contract, the 1:1 commission ratio was a term thereof, and T-Mobile had breached that term by modifying it for the SCVNGR account. Alternatively, Daly asserted a claim for unjust enrichment. In May, 2017, the judge granted summary judgment in favor of the defendants on all claims.
Discussion. We review a grant of summary judgment to determine "whether, viewing the evidence in the light most favorable to the nonmoving party, all material facts have been established and the moving party is entitled to a judgment as a matter of law." Augat, Inc. v. Liberty Mut. Ins. Co., 410 Mass. 117, 120 (1991). When there are no genuine issues of material fact and the nonmoving party "has no reasonable expectation of proving an essential element of its case," the entry of summary judgment will be upheld. Miller v. Mooney, 431 Mass. 57, 60 (2000).
1. Breach of contract. T-Mobile asserts that summary judgment should enter as to Daly's breach of contract claim because the sales manuals (upon which Daly's contract claim is based) expressly disclaim that they are promises or contracts. Alternatively, T-Mobile contends that there was no breach of any term of the manuals because the manuals allow T-Mobile to adjust Daly's commissions for the SCVNGR account and because Daly continued to work for T-Mobile, after acknowledging the modification.
a. Disclaimers in manuals. Provisions in employment manuals may be enforced "to the extent they instill reasonable belief in the employees that management will adhere to the policies therein expressed." Ferguson v. Host Intl., Inc., 53 Mass. App. Ct. 96, 101-102 (2001), citing O'Brien v. New England Tel. & Tel. Co., 422 Mass. 686, 694 (1996). "[W]hile the words used in such handbooks and policies are important, 'the context of the ... preparation and distribution [of the employment policies] is ... the most persuasive proof' as to whether the employee's reliance thereon as a binding and legally enforceable commitment, is reasonable." LeMaitre v. Massachusetts Tpk. Authy., 452 Mass. 753, 755-756 (2008), quoting from O'Brien, 422 Mass. at 694.
The Supreme Judicial Court has not decided "whether an employer must utilize a specific set of words in its employee handbooks or personnel policies in order to avoid their legal enforceability." Id. at 755. However, this court has said that "if the employer, for whatever reason, does not want the manual to be capable of being construed by the court as a binding contract, there are simple ways to attain that goal. All that need be done is the inclusion in a very prominent position of an appropriate statement that there is no promise of any kind by the employer contained in the manual; that regardless of what the manual says or provides, the employer promises nothing." Ferguson, 53 Mass. App. Ct. at 102, quoting from Woolley v. Hoffmann-La Roche, 99 N.J. 284, 309 (1995).
Here, T-Mobile prominently disclaimed that the manuals comprised a contract. Cf. O'Brien, 422 Mass. at 694 (manual enforceable in contract where employer did not expressly retain right to unilaterally modify manual). The program manual includes, on its front cover, in font comparable in size as used in the remaining text of the manual, and set forth within a bolded box with a prominent border, the following disclaimer:
"Notice: This document contains guidelines relating to the compensation of T-Mobile Sales Professionals. This document and any oral, written or electronic communication related to the subject matter contained in this document are not intended and shall not be read to create any express or implied contract or promise of specific treatment or benefits in specific situations. Your employment relationship with T-Mobile is at-will and either you or T-Mobile can terminate your employment at any time without reason, cause or advance notice. In T-Mobile's sole discretion, this document and the guidelines stated herein may be changed or discontinued at any time without prior notice. You should regularly refer to this document (available on the company intranet and eLMS system) to ensure that you are familiar with its terms." (Emphasis added).
A near identical disclaimer is set forth, equally prominently, on the cover of the plan manual. Neither disclaimer was buried in the fine print. Cf. Ferguson, 53 Mass. App. Ct. at 103 (manual enforceable despite disclaimer "buried in the general, introductory portion of the manual, in a section not as likely to attract the employees' attention as the very specific list of obligations and benefits set out in the bulk of the manual"). Instead, T-Mobile put the text of the disclaimer prominently on the front cover of each of the manuals.
b. No breach of the terms of the manuals. We need not decide if these disclaimers render any reliance on the manuals unreasonable as a matter of law because, even assuming arguendo that the manuals could be construed as binding, Daly has no reasonable expectation of showing a breach. As set forth above, one provision of the program manual specifies that T-Mobile may exclude, adjust, or cap commissions for windfall sales -- a category of sales that includes sales in which T-Mobile has had to make concessions to win the business.[10] Here, there is no dispute that the SCVNGR deal was not one of T-Mobile's standard offerings; SCVNGR's proposed usage was different from ninety-nine percent of all sales made by Daly, and T-Mobile concluded that the SCVNGR deal required concessions (because the average revenue per unit [ARPU] on the SCVNGR account was orders of magnitude below the national and regional ARPU).[11] Given the terms of the provision expressly addressing commissions for windfall sales,[12] T-Mobile could (as it did here with regard to the SCVNGR account) modify the exemplary commission schedule consistent with the terms of the manuals. Doing so does not constitute a breach. Therefore, T-Mobile is entitled to summary judgment on Daly's breach of contract claim.
2. Wage Act claim. We turn next to Daly's Wage Act claim, which the defendants maintain is barred by the three-year statute of limitations[13] because T-Mobile modified Daly's commission rate for the relevant account in May or June 2011 and Daly did not file his complaint until July 2015, more than three years after the modification. Although the claim is not time-barred, we agree with the defendants that summary judgment should enter on their behalf.
a. Statute of limitations. As it concerns commissions, the Wage Act is triggered when those commissions are "definitely determined" and "become due and payable" to the employee. G. L. c. 149, § 148.[14] "[T]he statutory requirement that commissions be paid when they are 'definitely determined' means when they become 'arithmetically determinable.' " Weems v. Citigroup, Inc., 453 Mass. 147, 151 (2009), quoting from Wiedmann v. Bradford Group, Inc., 444 Mass. 698, 708 (2005).
Here, it is undisputed that Daly's commissions are based on the number of SIM cards activated in a particular quarter. Until that number is known, Daly's commissions are not "arithmetically determinable." Accordingly, Daly's Wage Act claim is not barred by the statute of limitations in so far as it concerns disputed commissions from July 23, 2012 (three years before he filed the present action) through the end of his employment at T-Mobile. See, e.g., Crocker v. Townsend Oil Co., 464 Mass. 1, 11 (2012).
b. No commissions due. Alternatively, the defendants contend that summary judgment should enter in their favor because Daly's commissions on the SCVNGR account were paid timely in accordance with the modification he acknowledged (before any SIM orders were placed on the SCVNGR account and perforce before any SIM cards were activated). Daly responds that, at the time he brought in the SCVNGR account, commissions were being calculated at a rate of 1:1 pursuant to T-Mobile's two sales manuals, and that the defendants' modification of the commission rate (to 1:5) in May or June, 2011, cannot be applied to this account because the modification occurred after Daly brought the account to T-Mobile's attention in March, 2011. Daly also contends that, at the least, summary judgment is improper because that there is a dispute as to whether his job responsibilities included signing new accounts such that by bringing in SCVNGR as a new client he "performed" his job prior to the May/June, 2011, change to his commission schedule.
Even if we assume that bringing in a new account was part of Daly's responsibilities,[15] Daly's Wage Act claim fails. The manuals upon which he would rely expressly state that commissions are not earned by signing a new account. In particular, the program manual provides that "[v]ariable incentives are not ... earned when ... a new account is activated." Consistent with this, Daly concedes that, at all relevant times, the commission component of his compensation was based solely on the number of SIM cards activated by the particular customer in each quarter, regardless whether the customer was an existing customer from his assigned accounts or a new customer.
While T-Mobile could not alter commissions retroactively after SIM activations,[16] nothing in the Wage Act prevented T-Mobile from exercising its discretion[17] to alter the commission formula prior to such time.[18] See, e.g., Vonachen v. Computer Assocs. Intl., 524 F. Supp. 2d 129, 134-137 (D. Mass. 2007). Accordingly, summary judgment properly entered in favor of the defendants on Daly's Wage Act claim.
3. Unjust enrichment. T-Mobile next asserts that Daly's unjust enrichment claim fails because he was paid what he was promised on the SCVNGR account. As discussed supra, Daly acknowledged his commission rate for the account prior to any SIM card sales to SCVNGR, his commissions were based solely on SIM card activation (not on bringing in a client), and he was paid pursuant to the modified commission rate. As a matter of law, there is no basis for Daly's claim that T-Mobile was unjustly enriched, and the defendants are entitled to summary judgment. See Community Builders, Inc. v. Indian Motorcycle Assocs., Inc., 44 Mass. App. Ct. 537, 560 (1998).
Judgment affirmed.

The judge also granted summary judgment on Daly's claim, pursuant to the Wage Act, of unlawful retaliation. Daly raises no argument on appeal as to this claim. Accordingly, any challenge to this aspect of the judge's order is waived. Mass.R.A.P. 16(a)(4), as amended by 367 Mass. 921 (1975). Sullivan v. Liberty Mut. Ins. Co., 444 Mass. 34, 38 n.9 (2005).

A SIM is a small chip that can be inserted in a mobile device and tracks identifying information about its usage.

As set forth infra, the disputed commission schedule was implemented in 2011. Accordingly, we set forth the relevant terms of the manuals covering that period.

Windfall sales include, among other things, sales in which T-Mobile has had to make concessions to win the business.

The 1:5 ratio meant that Daly would receive one credit towards his commission quota for five SIMs activated on the SCVNGR account -- an eighty percent reduction relative to the 1:1 ratio that governed Daly's other accounts.

Neither party has produced this document, although both sides agree that it was presented and signed.

For the first 200 SIMs, which SCVNGR purchased in June of 2011, however, Daly was paid on a 1:1 basis. According to T-Mobile, this was done because the 1:5 ratio had not been implemented in T-Mobile's commissions system.

Daly contends that T-Mobile's ability to adjust sales was limited to situations where the sales representative exceeds 200 percent of quota. This argument, however, ignores that the program manual expressly states that any adjustment in commissions to address the situation where the sales representative exceeds 200 percent of his or her quota is "[i]n addition to the Windfall Provision."

While Daly speculates that the SCVNGR deal was nonetheless profitable for T-Mobile, the manuals do not limit T-Mobile's ability to alter commissions based on profitability. Moreover, Daly admits that he had no knowledge of T-Mobile's ARPU; and, mere speculation that the SCVNGR deal could have been profitable even if he had been paid commissions pursuant to a 1:1 schedule is insufficient to defeat summary judgment. See Somers v. Converged Access, Inc., 454 Mass. 582, 597 (2009).

There is no dispute that the 1:5 commission ratio was established by June of 2011. For this reason, Daly's reliance on terms in the 2012 manuals and his argument regarding his payment on a 1:1 basis for the initial sales to SCVNGR are misplaced.

G. L. c. 149, § 150.

General Laws c. 149, § 148, provides, in relevant part: "This section shall apply, so far as apt, to the payment of commissions when the amount of such commissions, less allowable or authorized deductions, has been definitely determined and has become due and payable to such employee, and commissions so determined and due such employees shall be subject to the provisions of section one hundred and fifty." (Emphasis added).

Notably, Daly testified that, as a regional account manager (his position at the time the SCVNGR opportunity came to his attention in 2011), his responsibilities did not include bringing in new accounts.

Daly does not claim that T-Mobile deliberately delayed SIM activations once orders were placed by SCVNGR.

As set forth supra, the manuals specifically provide that T-Mobile may alter the method of calculating windfall commissions in its sole discretion, at any time.

As discussed supra, the statute of limitations limits Daly's Wage Act claim to those commissions purportedly due from and after July 23, 2012. Notably, by then, as Daly concedes, his commission schedule on the SCVNGR account had been established by T-Mobile and acknowledged by him for more than one year.