# United States Court of Appeals
## For the First Circuit

No. 22-1417

BRIAN KLAUBER,

Plaintiff, Appellant,

v.

VMWARE, INC.,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. F. Dennis Saylor, IV, U.S. District Judge]

Before

Kayatta, Selya, and Howard,
Circuit Judges.

David P. Angueira, with whom Swartz & Swartz, P.C. was on
brief, for appellant.
David L. Schenberg, with whom Mark H. Burak, Laurielle M.
Howe, and Ogletree, Deakins, Nash, Smoak & Stewart, P.C. were on
brief, for appellee.

August 11, 2023

SELYA, Circuit Judge.  Plaintiff-appellant Brian Klauber strives to persuade us that the district court erred in entering summary judgment in favor of his quondam employer, defendant-appellee VMware, Inc. (the Company), with respect to his contention that he was wrongfully deprived of hundreds of thousands of dollars in commissions allegedly due to him both under the Massachusetts Wage Act, see Mass. Gen. Laws ch. 149, § 148, and under the common law.  After first upholding the district court's application of Federal Rule of Evidence 408 and thus confirming the dimensions of the summary judgment record, we turn to the meat of the district court's thoughtful rescript and affirm its entry of summary judgment on all of the plaintiff's claims.

**I**

We briefly rehearse the relevant facts and travel of the case.

**A**

The Company is a computer software firm.  The plaintiff worked there — in different sales roles — for about six years between July of 2012 and September of 2019.  While employed at the Company, the plaintiff's compensation comprised a combination of a base salary plus commissions.

The commission arrangement lies at the epicenter of this appeal.  The plaintiff's commissions were governed by two integrated agreements.  The first was an individualized commission

plan, which set the plaintiff's standard commission rates, compensation targets, and product quotas. The second was a set of terms and conditions applicable to the plaintiff's commission plan.[1] The Company periodically revised and reissued these agreements and — each time a revised agreement emerged — the plaintiff signed it (thereby confirming his agreement to the revised terms and conditions).

The Company's fiscal year (FY) spanned the period from February of the preceding year through January of the listed year. The terms and conditions relevant to the contested commissions were the versions in effect during the second half of FY 2018 and the second half of FY 2019. Except where otherwise noted, the relevant language remained essentially the same across the different versions.

The terms and conditions stipulated that a commission was only considered "earned" once three requirements had been satisfied. We summarize them succinctly.

The starting point, of course, is that the employee must have "[a]ccepted his or her [c]ompensation [p]lan." Next, the employee must have had "eligible [q]uota [a]chievement." Finally, a "Plan Reconciliation, including but not limited to the review of any transactions deemed to be Exception Transactions, splits, and

_____

[1] The record reveals that these terms and conditions applied to commission payments for all eligible employees.

- 3 -

other Adjustments, [must have] been completed by [the Company], analyzing all commissionable events, draws, [c]ommissions paid, and factors affecting Variable Compensation." Plan Reconciliation was, in a nutshell, the process through which the Company determined whether and how much to adjust commissions for Exception Transactions — Company parlance for atypical transactions.

The first two requirements are not in issue here, so we train the lens of our inquiry on the third requirement. As already noted, the terms and conditions specifically authorized adjustments to commissions for Exception Transactions. The terms and conditions included examples of transactions that would be deemed Exceptions: the top ten customer deals within a quarter[2]; transactions in which the value exceeded the employee's assigned quota; certain transactions valued over $2,000,000; transactions with "atypical management involvement," including transactions with limited involvement by the employee; and transactions "that contain[ed] non-standard terms or [were] atypical or extraordinary for some other reason."

If a transaction was deemed to be an Exception Transaction by the Company, according to these descriptive specifications, the head of worldwide sales (in FY 2018) or the

---

[2] This example appears only in the FY 2018 terms and conditions; it does not appear in the FY 2019 terms and conditions. For present purposes, that omission does not have any particular significance.

- 4 -

head of the sales compensation committee (in FY 2019) could, in his or her "sole discretion," authorize adjustments to any commissions claimed with respect to that transaction. The commission schedule set by an employee's individualized commission plan served as the baseline, and any adjustments were determined on a case-by-case basis.

In FY 2019, the terms and conditions were augmented to add a "Large Deal Review Policy." The added policy stated that a review similar to that employed for Exception Transactions would be conducted on deals valued at $10,000,000 or more. Any resulting commission adjustments would require approval by the sales compensation committee.

**B**

Against this backdrop, we turn to the transactions that undergird the plaintiff's claims.

**1.** In FY 2018, the Company closed a deal with DXC Technology Corporation (DXC). That deal was one of the most munificent that the Company had ever consummated: it was worth over $130,000,000. The plaintiff's role involved educating the customer and answering technical questions about the Company's products. He claims that he should have been paid a commission of $32,124.99.

The head of worldwide sales designated the deal an Exception Transaction because it was one of the top ten deals in

- 5 -

the quarter, there was heavy senior-management involvement and limited involvement of many lesser employees (including the plaintiff), and the deal was structured in an unorthodox fashion. The Company then determined, through Plan Reconciliation, that the plaintiff had not been a core member of the sales team and that his limited involvement necessitated a severe commission adjustment. As a result, his commission was reduced to zero.

2. In FY 2019, the Company closed a deal with Barclays Bank (Barclays) worth between $40,000,000 and $50,000,000. With respect to this deal, the plaintiff was the Company's "landed representative" in North America (which meant that he was responsible for helping to manage relationships and sell products to the financial services industry in North America). The deal was designated by the Company as both a "Large Deal" and an Exception Transaction because, among other things, it exceeded certain employees' assigned quotas. At the end of the line — through Plan Reconciliation — the Company determined that the plaintiff's commission should be adjusted downward based on his limited role in the deal: he had joined the team as landed representative just three months before the transaction closed (after most major negotiations had transpired), and he had not been present with the core deal team in London. Accordingly, his commission — which the plaintiff asserts should have been in the amount of $429,153.57 — was scaled back to $208,721.58.

## C

The plaintiff was displeased with these commission adjustments, but he did not complete the Company's internal dispute resolution process with respect to either of them. Instead, he resigned in September of 2019 and — the following month — he brought suit against the Company in a Massachusetts state court. He asserted claims for nonpayment of wages under the Wage Act, breach of contract, unjust enrichment, and quantum meruit. Citing the parties' diverse citizenship and the amount in controversy, the Company removed the action to the United States District Court for the District of Massachusetts. See 28 U.S.C. §§ 1332(a), 1441(a).

After discovery closed, the Company moved for summary judgment across the board. The plaintiff opposed the motion. At that point, the Company moved to strike certain portions of the plaintiff's opposition, and the plaintiff objected to that motion.

The district court granted in part and denied in part the Company's motion to strike. See Klauber v. VMware, Inc., 599 F. Supp. 3d 34, 37 (D. Mass. 2022). Thereafter, the court granted the motion for summary judgment. See id. The court held that the terms and conditions ancillary to the plaintiff's commission plan were enforceable under Massachusetts law. See id. at 48. It then held that the commissions that the plaintiff claimed he was owed were not "wages" within the meaning of the Wage Act and, thus, not

subject to the Act's protections.  See id.  With respect to the breach of contract claim, the court held that the terms and conditions allowed the commission adjustments.  See id.  And, finally, the court determined that the plaintiff had no claim for relief under theories of unjust enrichment and/or quantum meruit because there was a valid contract between the parties.  See id. at 48-49.

This timely appeal followed.

## II

In this venue, the plaintiff challenges the district court's partial grant of the Company's motion to strike.  He also challenges the district court's entry of summary judgment on his various claims.  We address these challenges separately.

## A

We start with the plaintiff's evidentiary challenge.  He submits that the district court erred in granting in part the Company's motion to strike certain portions of his response to its motion for summary judgment.  We think not.

We "review the district court's evidentiary rulings made as part of its decision on summary judgment for abuse of discretion."  Hoffman v. Applicators Sales & Serv., Inc., 439 F.3d 9, 13 (1st Cir. 2006).  "'Abuse of discretion' is a phrase which sounds worse than it really is."  Aggarwal v. Ponce Sch. of Med., 745 F.2d 723, 727 (1st Cir. 1984) (quoting In re Josephson, 218

F.2d 174, 182 (1st Cir. 1954)). In the ordinary course, we "will not find an abuse of discretion unless perscrutation of the record provides strong evidence that the trial judge indulged in a serious lapse in judgment." Hoffman, 439 F.3d at 14 (quoting Texaco P.R., Inc. v. Dep't of Consumer Affs., 60 F.3d 867, 875 (1st Cir. 1995)).

When adjudicating a motion for summary judgment, a district court customarily may consider only evidence that would be admissible at trial. See Garside v. Osco Drug, Inc., 895 F.2d 46, 49-50 (1st Cir. 1990); see also Fed. R. Civ. P. 56(c)(2). But this general rule, like most general rules, admits of exceptions. One exception, relevant here, is that the district court may consider an "affidavit or declaration" as long as it is "made on personal knowledge, set[s] out facts that would be admissible in evidence, and show[s] that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4).

With this plinth in place, we turn to Federal Rule of Evidence 408. In pertinent part, the rule bars the admission of certain types of settlement-related evidence "either to prove or disprove the validity . . . of a disputed claim." Fed. R. Evid. 408(a); see, e.g., Rodriguez-Garcia v. Mun. of Caguas, 495 F.3d 1, 11-12 (1st Cir. 2007); McInnis v. A.M.F., Inc., 765 F.2d 240, 246-48 (1st Cir. 1985). This includes evidence of "furnishing, promising, or offering — or accepting, promising to accept, or

offering to accept — a valuable consideration in compromising or attempting to compromise the claim." Fed. R. Evid. 408(a)(1).

As a general matter, then, the purpose of Rule 408 is "to promote a public policy favoring the compromise and settlement of claims" by shielding negotiations from use in later litigation. McInnis, 765 F.2d at 247; see Catullo v. Metzner, 834 F.2d 1075, 1078-79 (1st Cir. 1987). The drafters of the rule had in mind that settlement evidence "is of questionable relevance on the issue of liability . . . , since settlement may well reflect a desire for peaceful dispute resolution, rather than the litigants' perceptions of the strength or weakness of their relative positions." McInnis, 765 F.2d at 247. Even so, Rule 408 does not preclude the introduction of evidence relating to settlements and compromises for other purposes, such as showing notice or "proving a witness's bias or prejudice." Fed. R. Evid. 408(b); see Rodriguez-Garcia, 495 F.3d at 11-12.

In response to the Company's motion for summary judgment in this case, the plaintiff filed — under seal — a memorandum in opposition, a statement of undisputed material facts (UMF Statement), and several related documents. The Company moved to strike certain portions of the memorandum, one paragraph of the UMF Statement, one paragraph of the plaintiff's supporting affidavit, one paragraph of an affidavit executed by the plaintiff's counsel, and an exhibit annexed to counsel's

- 10 -

affidavit. Each of these challenged items referred back to an earlier suit (the Sanderson suit), in which the plaintiff and three co-workers sued the Company for alleged violations of the Wage Act arising in connection with their commission plans. The Sanderson suit was settled, pursuant to a confidential agreement, in 2016.

The district court denied the motion to strike in part and granted it in part. See Klauber, 599 F. Supp. 3d at 37. The court denied the motion as to counsel's affidavit and the attached exhibit, which consisted of a redacted version of the 2016 settlement agreement in the Sanderson suit. See id. at 44. The court concluded that the plaintiff had introduced the "evidence of the settlement agreement to show his state of mind when signing off on [the Company's] terms, and not to prove or disprove the validity of his current claims." Id. at 43. And "[w]hatever the relevance of his then-existing mental state," that purpose did not offend Rule 408. Id.

In all other respects, the district court granted the motion to strike. See id. at 45. The challenged paragraphs in the UMF Statement and the plaintiff's affidavit were sisters under the skin. The former read: "After extensive discovery in the matter of Sanderson . . . , the matter was resolved as a result of [p]laintiff's arguments that [the Company's] conduct of improperly reducing its employees' commission payments was not enforceable under Massachusetts law." Id. The latter read: "After extensive

- 11 -

discovery in that matter, the case was resolved as a result of our claims that [the Company's] employment contracts with us were not enforceable due to the unilateral and arbitrary provisions allowing [the Company] to change our commissions after the fact." Id. at 44-45. The memorandum added that "[m]ultiple provisions in [the terms and conditions] are illegal under Massachusetts law; a fact that [the Company] became well aware of over the course of [its] previous litigation with [the plaintiff]." Id. at 45.

The district court struck the challenged paragraphs in the UMF Statement and the plaintiff's affidavit as well as two paragraphs in the memorandum. In the court's judgment, these materials impermissibly offered information about the settlement agreement in the Sanderson suit in an attempt to prove the validity of the plaintiff's current claims. See id. These materials, the court concluded, were "offered to demonstrate that [the Company] settled the prior litigation because the terms and conditions related to the payment of commissions were unenforceable under Massachusetts law," which was essentially the same claim that the plaintiff was pressing in the current litigation. Id.

In reaching this conclusion and in partially granting the motion to strike, the district court acted within the compass of its discretion. The court painstakingly distinguished between the evidence that the plaintiff offered to show that he believed the terms and conditions were unenforceable (which it admitted)

and the evidence that the plaintiff offered to show that the Company settled the Sanderson suit because the terms and conditions were unenforceable under Massachusetts law (which it struck). The two bodies of evidence served different purposes (one permissible and one impermissible), and the court appropriately differentiated between them on this basis. Drawing this line of demarcation and acting upon it was plainly not an abuse of discretion.

The plaintiff demurs. He contends that the purpose of the excluded evidence, like that of the admitted evidence, was to show his "intent and state of mind when signing" the terms and conditions pertinent to the commission plans at issue here (by which he means his understanding that those terms and conditions were unenforceable under Massachusetts law). This evidence, he says, was also admissible to prove the Company's knowledge that he believed the terms and conditions to be unenforceable and to refute the Company's position that he knew the terms and conditions were enforceable.

These contentions take the plaintiff in circles. The excluded materials explicitly asserted that the settlement had been reached because the commission arrangement was unenforceable — the precise issue that this case presents. To state, for example, that the Sanderson suit was "resolved as a result of our claims that" the terms and conditions were "not enforceable due to the unilateral and arbitrary provisions" is a blunt attempt to use

a prior settlement to prove the validity of an eerily similar claim currently before the court — a blunt attempt that Rule 408(a) forbids. Those statements, as the district court astutely observed, impermissibly "refer[] to the settlement agreement to establish that the current claim at issue has already been decided — that is, that [the Company's] contracts are unenforceable under Massachusetts law." Id.

Finally, even if we were to discern any semblance of error with respect to the district court's ruling on the motion to strike (which we do not), any such error would be harmless. See Dusel v. Factory Mut. Ins. Co., 52 F.4th 495, 511 (1st Cir. 2022) ("We may affirm in spite of an erroneous evidentiary ruling if the error was harmless, meaning that it is highly probable that the error did not affect the outcome of the case." (internal quotation marks omitted) (quoting Tersigni v. Wyeth, 817 F.3d 364, 369 (1st Cir. 2016))); see also Fed. R. Civ. P. 61. The plaintiff claims that he offered the excluded evidence to show his subjective intent when agreeing to the terms and conditions — that is, that he believed the terms and conditions to be unenforceable. But evidence of the plaintiff's subjective intent when entering into the commission plans is immaterial under Massachusetts law. See Greene v. Ablon, 794 F.3d 133, 147 (1st Cir. 2015) (applying Massachusetts law); Okerman v. VA Software Corp., 871 N.E.2nd 1117, 1125 (Mass. App. Ct. 2007). Thus, any evidence of the plaintiff's

- 14 -

subjective intent when accepting the terms and conditions would not have moved the needle at all.

In variations on this theme, the plaintiff argues that he wanted to introduce the evidence for two other reasons: to show the Company's knowledge of his belief that the terms and conditions were unenforceable and to show his lack of knowledge of the Company's position that they were enforceable. These arguments were not advanced below and, thus, are foreclosed on appeal. See Teamsters Union, Local No. 59 v. Superline Transp. Co., 953 F.2d 17, 21 (1st Cir. 1992) ("[A]bsent the most extraordinary circumstances, legal theories not raised squarely in the lower court cannot be broached for the first time on appeal.").

That ends this aspect of the matter. We hold that the district court did not abuse its discretion in granting in part the Company's motion to strike portions of the plaintiff's opposition to the Company's motion for summary judgment.

**B**

We turn next to the plaintiff's substantive claims. In addressing those claims, we must keep in mind that this case is in a federal court solely by virtue of diversity jurisdiction. Consequently, state law supplies the substantive rules of decision. See Erie R.R. Co. v. Tompkins, 304 U.S. 64, 78 (1938); Conformis, Inc. v. Aetna, Inc., 58 F.4th 517, 528 (1st Cir. 2023). The parties agree that the law of Massachusetts controls, and we

- 15 -

accept that reasonable agreement.  See Borden v. Paul Revere Life Ins. Co., 935 F.2d 370, 375 (1st Cir. 1991).

We review the entry of summary judgment de novo.  See Minturn v. Monrad, 64 F.4th 9, 13 (1st Cir. 2023).  Summary judgment is appropriate when the movant has shown "that there is no genuine dispute as to any material fact" and that it is thus "entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  In conducting this tamisage, we construe the record in the light most hospitable to the nonmoving party (here, the plaintiff) and draw all reasonable inferences to his behoof.  See Minturn, 64 F.4th at 14.  When engaging in this mode of review, "[w]e are not tied to the district court's rationale but, rather, may affirm the judgment on any ground made manifest by the record."  Id.

**1**

We first consider the Wage Act claims.  The Act "imposes liability on employers who fail to pay wages earned by their employees."  Ellicott v. Am. Cap. Energy, Inc., 906 F.3d 164, 169 (1st Cir. 2018); see Mass. Gen. Laws ch. 149, § 148.  There is no doubt that the plaintiff was an employee of the Company.  The principal question before us is whether the commissions that he insists were owed qualify as protected wages.

Commissions may qualify as wages, sheltered by the Wage Act, in certain circumstances.  See Parker v. EnerNOC, Inc., 139 N.E.3d 328, 333 (Mass. 2020).  To separate wheat from chaff, we

- 16 -

must start with the premise that commissions are "contingent compensation." Mui v. Mass. Port Auth., 89 N.E.3d 460, 463 (Mass. 2018). Thus, the prophylaxis of the Wage Act applies to commissions only when "two conditions [have been] met: (1) the amount of the commission 'has been definitely determined'; and (2) the commission 'has become due and payable.'"[3] Parker, 139 N.E.3d at 333 (quoting Mass. Gen. Laws ch. 149, § 148).

A commission is "definitely determined" when it is "'arithmetically determinable,' taking into account the 'applicable formulas and deductions' and the 'total from which deductions would be taken.'" Okerman, 871 N.E.2d at 1124 (quoting Wiedmann v. Bradford Grp., 831 N.E.2d 304, 312 (Mass. 2005), abrogated on other grounds by Mass. Gen. Laws ch. 149, § 150, as amended by 2008 Mass. Acts 71). But even if a commission is susceptible to definite determination, it is not "due and payable" until all "dependent contingencies have been met." Ellicott, 906 F.3d at 169.

---

[3] The Massachusetts Supreme Judicial Court has left open the possibility of commissions constituting "wages" under the Wage Act despite not having been "definitely determined" and "due and payable," at least in the context of a claim based on retaliation. See Parker, 139 N.E.3d at 334-35; Mass. Gen. Laws ch. 149, § 148A. There is no claim for retaliation here. The claims in this case are simply for nonpayment of wages. See Mass. Gen. Laws ch. 149, § 148. Thus, we tailor our analysis to the claims before us, bringing into play the longstanding rule that commissions must be "definitely determined" and "due and payable" to constitute "wages" under the Act. See Ellicott, 906 F.3d at 169.

- 17 -

To be sure, the default rule is that a commission "becomes due and payable when the employee closes the sale, even if there is a delay in actual payment on the sale." Id. at 170 (quoting McAleer v. Prudential Ins. Co. of Am., 928 F. Supp. 2d 280, 289 (D. Mass. 2013)). This default rule, though, is not a fixed part of the "due and payable" calculus: an employer and an employee may agree to different terms, thus modifying or eliminating the default rule. Here, the commission plan agreed to by the parties specifically set out other contingencies. In such instances, "courts apply the terms of the plan." Id. (quoting McAleer, 928 F. Supp. 2d at 289).

We turn, then, to the particular terms and conditions that the parties agreed would determine the extent of any commissions. Those terms and conditions provided — as material here — that commissions were only "earned" once three additional contingencies had been met: first, the plaintiff must have accepted the commission plan; second, the plaintiff must have had "eligible [q]uota [a]chievement"; and third, Plan Reconciliation, "including but not limited to the review of any transactions deemed to be Exception Transactions," must have been completed.

The plaintiff admits that he accepted and agreed to the commission plan. He further admits that the plan's terms and conditions spelled out the additional contingencies through which his commissions would become "earned" and, thus, "due and payable,"

- 18 -

including, for Exception Transactions, the completion of Plan Reconciliation. Nor does he gainsay that the DXC and Barclays deals were properly characterized as Exception Transactions.

Notwithstanding these admissions, the plaintiff insists that his commissions were "due and payable" and — as such — under the protective carapace of the Wage Act. In taking this stance, the plaintiff posits that a portion of the terms and conditions (specifically, the third contingency) is unenforceable under the Wage Act because Plan Reconciliation, in practice, gives the Company "unfettered authority to withhold pay" through commission adjustments. The Company counters that all of the terms and conditions, including the Plan-Reconciliation contingency, are enforceable under the Wage Act; that the plaintiff's claimed commissions could not be deemed "earned" unless and until they were upheld at the Plan-Reconciliation stage; and that the only commissions on the DXC and Barclays deals that were "due and payable" were those approved through Plan Reconciliation.

We find the Company's arguments more persuasive. Under Massachusetts law, employers and employees may agree to contingencies that must be satisfied before commission payments become due and payable such that they qualify as protected earnings for Wage Act purposes. See id. The terms and conditions to which the plaintiff and the Company mutually agreed provided that — in the event a transaction was determined to be an Exception

Transaction — commissions would not be "earned" unless and until Plan Reconciliation had taken place. In furtherance of this provision, those terms and conditions spelled out that the office of Plan Reconciliation was to determine whether there would be adjustments to the employee's commission calculation. The terms and conditions imposed no limits on the extent of those adjustments. And under the plain terms of the parties' agreement, Plan Reconciliation was a contingency which had to be met before a commission on an Exception Transaction was due and payable.

Although the plaintiff originally agreed to this arrangement, he now attacks it. He says that the Plan-Reconciliation contingency should be disregarded because it gives the Company unfettered discretion to adjust commissions on any transaction without limit. He attempts to draw support from the terms and conditions, which defined the Plan-Reconciliation contingency as "including but not limited to the review of any transactions deemed to be Exception Transactions."

The plaintiff's attack misses the mark. There is not a shred of evidence that the Company ever used Plan Reconciliation to adjust commissions on any transactions other than those that were deemed to be Exception Transactions. Rather, the evidence shows that adjustments were made to commissions through Plan Reconciliation only after particular transactions had been classified as Exception Transactions. Exception Transactions were

thus in a class of their own, defined by the terms and conditions to encompass only atypical deals. Membership in that class was determined by whether a given transaction included some unusual element or elements, examples of which were the top ten customer deals within a quarter, deals in which the value exceeded the employee's assigned quota, and deals with "atypical management involvement." It is reasonable that different criteria would affect an employee's entitlement to commissions with respect to atypical transactions (where applying standard commission rates could easily lead to windfalls). And both the DXC and Barclays transactions were — as the plaintiff concedes — appropriately deemed Exception Transactions based on the criteria limned in the terms and conditions.

We add, moreover, that the plaintiff received a salary as well as standard commissions on typical transactions. Only after the DXC and Barclays transactions were deemed Exception Transactions did the Company's right to adjust the commission structure come into play (to account for the atypical nature of the transactions). So viewed, the fact that there was discretion in the calculation of commission adjustments for that limited class of transactions does not allow the Company the free rein over commissions that the plaintiff ascribes to it. And at any rate, nothing in Massachusetts law prevents commission arrangements from incorporating subjective criteria. See Vonachen v. Comput.

Assocs. Int'l, 524 F. Supp. 2d 129, 134-35 (D. Mass. 2007) (enforcing provision giving employer "explicit discretion" to adjust commissions for large transactions); see also Daly v. T-Mobile USA, Inc., 110 N.E.3d 1220, *5 (Mass. App. Ct. 2018) (unpublished opinion) (concluding that provision in employment manual allowing employer to adjust commission formula before commissions became "due and payable" was enforceable).

In an effort to pump the brakes on this reasoning, the plaintiff relies on the decision in McAleer v. Prudential Insurance Co. of America, 928 F. Supp. 2d 280. But the plaintiff reads McAleer through rose-colored glasses and — read through untinted lenses — McAleer does not gain him any traction.

The McAleer court acknowledged that a commission plan could incorporate discretion as to "factual determinations, calculations, and eligibility" regarding commissions. Id. at 288. There, however, the employer argued that the terms of the applicable plan granted it even more discretion than those terms actually allowed. See id. The court did not hold — as the plaintiff's cherry-picked excerpts tend to indicate — that contingencies incorporating broad discretion will not be enforced according to their tenor.

The short of it is that the Company's commission plan did not violate the Wage Act. Under that plan, the plaintiff's commissions on Exception Transactions were not earned (and, thus,

not due and payable) until the Company had completed Plan Reconciliation. Consequently — as the district court ruled — "[a]ny potential commissions on those deals, prior to the occurrence of a [P]lan [R]econciliation, would . . . not qualify as wages under the statute." Klauber, 599 F. Supp. 3d at 47-48 (emphasis in original).

## 2

The plaintiff does not go quietly into this dystopian night. He raises (or at least suggests) a plethora of other arguments aimed at resuscitating his Wage Act claims. Without exception, these arguments are unpersuasive, undeveloped, or in some instances, both unpersuasive and undeveloped. We reject them out of hand, pausing only to offer three brief comments.

As a start, the plaintiff invokes yet another provision of the Wage Act: the "special contract" provision. Under this provision, "[n]o person shall by a special contract . . . exempt himself from" the Wage Act. Mass. Gen. Laws ch. 149, § 148. The plaintiff asserts that this proviso renders the terms and conditions ancillary to his commission plan unenforceable because requiring commissions to go through Plan Reconciliation gives the Company the ability to "withhold commission payments after an employee has completed work on the deal."

We do not agree. As we have said, commissions only qualify as wages under the Wage Act once they are "due and

payable." Commissions are not necessarily due and payable simply because "an employee has completed work on the deal." After all, a commission plan may incorporate other contingencies that must be met before a commission is due and payable — and if those contingencies are not met, the commissions do not become wages protected by the Wage Act. See Ellicott, 906 F.3d at 169-70, (construing Massachusetts law); Parker, 139 N.E.3d at 333.

In all events, Massachusetts courts have been consentient in holding that the special contract provision only bars agreements to exempt wages from the prophylaxis of the Wage Act. See Weems v. Citigroup Inc., 900 N.E.2d 89, 93 n.9 (Mass. 2009) ("Because of our conclusion that the [compensation] at issue here do[es] not constitute wages under the [A]ct, the special contract provision does not apply."); see also Camara v. Att'y Gen., 941 N.E.2d 1118, 1121 (Mass. 2011) (explaining that special contract provision prohibits employers from withholding payment of "any earned wages" (emphasis omitted)). Thus, if compensation does not qualify as wages under the Wage Act, the special contract provision does not apply at all. So it is here.

Arguing for a different rule, the plaintiff relies on the decision in Crocker v. Townsend Oil Co., 979 N.E.2d 1077 (Mass. 2012). His reliance is mislaid. The Crocker court held that a general release of claims included in a termination agreement would violate the special contract provision, but that a retrospective

release of Wage Act claims would be enforceable so long as it was "voluntary and knowing" and included "express language that Wage Act claims [we]re being released." Id. at 1079-80. Crocker has no discernable bearing on the issues before us.

The plaintiff's other arguments fare no better because all of them depend on the incorrect premise that the contingencies in the terms and conditions ancillary to the plaintiff's commission plan are unenforceable. For example, the plaintiff claims that the Wage Act required his commissions to be paid promptly after he met "all the required contingencies for commission payment by completing the work assigned and meeting the sales quotas outlined in [his] individual compensation plan." But the terms and conditions explicitly delineate other contingencies, and courts must enforce other valid contingencies to which the parties have agreed. See Ellicott, 906 F.3d at 170.

By the same token, there is no merit to the plaintiff's claim that the district court erred in concluding that he had only "limited involvement," Klauber, 599 F. Supp. 3d at 41-42, in the DXC and Barclays transactions (in which he claims he played a "key role"). Any factual dispute regarding his role, though, is immaterial to his legal claim. The case might be different, say, if the plaintiff had brought a claim under the implied covenant of good faith and fair dealing that inheres in every contract and alleged that the Company "violate[d] [his] reasonable

expectations" while performing the Plan Reconciliation. <u>Chokel</u> v. <u>Genzyme Corp.</u>, 867 N.E.2d 325, 329 (Mass. 2007). Here, however, the plaintiff's only claim is that the potential commissions should be considered wages owed. That claim fails on the basis that the commission adjustments made by the Company were allowed under Massachusetts law.

To say more about the plaintiff's Wage Act claims would be to paint the lily. It is clear that the terms and conditions agreed to by the parties set valid contingencies that had to be met before a commission could be earned. Until those contingencies were satisfied, any potential commissions did not become due and payable and, thus, did not qualify as "wages" within the purview of the Wage Act. The plaintiff's Wage Act claims therefore fail.

**3**

This brings us to the plaintiff's final assignments of error: that the district court erred in granting summary judgment on his claims for breach of contract, unjust enrichment, and quantum meruit. These assignments of error are plainly without merit.

To show a breach of contract, "the plaintiff must prove that a valid, binding contract existed, the defendant breached the terms of the contract, and the plaintiff sustained damages as a result of the breach." <u>Minturn</u>, 64 F.4th at 14 (quoting <u>Young</u> v. <u>Wells Fargo Bank, N.A.</u>, 828 F.3d 26, 32 (1st Cir. 2016)) (applying

Massachusetts law). Here, the plaintiff's breach of contract claim is nothing more than a reframing of his Wage Act claims. He argues that the Company violated his individualized commission plan by failing to honor the commission calculations required thereunder. But the plaintiff has not even tried to explain why the commission adjustments made by the Company violated the terms and conditions that explicitly authorized commission adjustments for Exception Transactions.

Stripped of rhetorical flourishes, the plaintiff's argument in this respect relies entirely on the premise that the terms and conditions ancillary to his commission plan are unenforceable. And it is evident to us — as it was to the district court, Klauber, 599 F. Supp. 3d at 48 — that the terms and conditions were enforceable. See supra Part II(B)(1). The plaintiff's alternative argument that he did not intend to be bound by the terms and conditions is similarly unavailing. See Greene, 794 F.3d at 147 ("[T]he formation of a valid contract under Massachusetts law requires objective, not subjective, intent."); see also supra Part II(A). It follows that summary judgment in favor of the Company was appropriate on the plaintiff's breach of contract claim.

The plaintiff's unjust enrichment and quantum meruit claims also fail. Neither unjust enrichment nor quantum meruit is an available avenue of recovery when a valid contract governs the

parties' obligations.  See Metro. Life Ins. Co. v. Cotter, 984 N.E.2d 835, 849 (Mass. 2013); Bos. Med. Ctr. Corp. v. Sec'y of Exec. Off. of Health & Hum. Servs., 974 N.E.2d 1114, 1132 (Mass. 2012); see also Klauber, 599 F. Supp. 3d at 48-49.  That is the case here.

## III

We need go no further.  For the reasons elucidated above, the judgment of the district court is

**Affirmed**.